1

2

3

4

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

5

6

7

8

9

MARGARET SANTOYO,

               Plaintiff,

    v.

HOWMEDICA OSTEONICS CORP.,

             Defendant.

CASE NO. C15-5264 BHS

ORDER GRANTING IN PART
AND DENYING IN PART
DEFENDANT'S MOTION FOR
PROTECTIVE ORDER

10

11

12

13

14

     This matter comes before the Court on Defendant Howmedica Osteonics Corp.'s

("HOC") motion for protective order (Dkt. 19). The Court has considered the pleadings

filed in support of and in opposition to the motion and the remainder of the file and

hereby grants in part and denies in part the motion for the reasons stated herein.

15

**I. PROCEDURAL HISTORY**

16

17

18

19

     On April 9, 2015, Plaintiff Margaret Santoyo ("Santoyo") filed a first amended

complaint against HOC in Pierce County Superior Court for the State of Washington.

Dkt. 1, Exh. A ("Comp.").  Santoyo asserts various torts stemming from a hip

replacement surgery. *Id*.

20

     On April 24, 2015, HOC removed the matter to this Court.  Dkt. 1.

21

22

     On March 7, 2016, HOC filed a motion for a protective order.  Dkt. 19.  On March

1, 2016, Santoyo responded.  Dkt. 27.  On March 8, 2016, HOC replied.  Dkt. 28.

## II. FACTUAL BACKGROUND

On January 8, 2007, Santoyo underwent a total hip replacement surgery.  Comp., ¶ 64.  During the surgery, Dr. Steven Teeny inserted two of HOC's products into Santoyo.  One of the components was an Accolade stem made of titanium, molybdenum, zinc and iron ("TMZF stem"), and the other was the LFIT Anatomic V40 Femoral Head, which is made out of cobalt and chromium.  *Id.*, ¶¶ 66–67.

In July 2012, tests revealed that Santoyo's hip components were loose, and Dr. Teeny recommended surgery to replace the components.  *Id.*, ¶¶ 77–78.  During the revision surgery, Dr. Teeny recorded notes as follows:

> Immediately upon entering the joint, a thick squirt of green, thick fluid was expressed seemingly under pressure. . . .This was immediately sent to laboratory for a gram stain and evaluation with some synovial tissue for evaluation which showed minimal chronic inflammation. No acute inflammation. No signs of polymorphonuclear leukocytes. With that in mind, the feeling was it had a clinical picture of an ALVAL type reaction. . . . We did a partial capsulectomy and capsulotomy which allowed us to express the femoral head. A bone tamp was used to remove it. It noted a large amount of corrosion material at the trunnion and some deep, what appeared to be corrosion materials deep inside the femoral head as well, even after head was removed. . . . The cup itself was completely loose. . . . More green purulent-like material was found behind the cup along with quite a bit of necrotic bone so that a fair portion of the posterior wall, some of the superior wall, some of the anterior wall and inferiorly all with significant bone loss. There was necrotic bone almost in a layer around the cup as well.

*Id.*, ¶ 80.  Dr. Teeny removed the LFIT metal head component and replaced it with a ceramic component.  *Id.*, ¶ 81.

Santoyo contends that her first hip components failed due to fretting and corrosion of the different types of metal in the components.  This allegation is based on Dr. Teeny's

1    observations as well as the fact that HOC has recalled other hip replacement components

2    made of the same metals.  *Id.*, ¶¶ 31–36.  Santoyo alleges that the "scientific community

3    has known for decades the combination of titanium and cobalt/chromium results in

4    significant fretting and corrosion when dissimilar metals are combined."  *Id.*, ¶ 37.

5    Despite this knowledge, Santoyo contends that HOC continued to sell components made

6    of these metals, and, after experiencing significant failure rates, HOC recalled its

7    Rejuvenate and ABG II metal components.  *Id.*, ¶¶ 45–46.  Santoyo further alleges that,

8    during the recall, HOC "redesigned the Accolade stem and abandoned the use of the

9    TMZF titanium and switched to a new titanium alloy."  *Id.*, ¶ 51.

10         Early in discovery, Santoyo sent HOC interrogatories and requests for production.

11   Through these requests, Santoyo seeks information relating to her old hip joint and

12   implanted head component, the revised head component, the TMZF stem component, and

13   HOC's recalled components.  *See* Dkt. 19, Exh. C.  HOC asserted numerous objections to

14   the discovery requests, including the objections that the requests are overbroad and

15   unduly burdensome.  *Id.*  The parties met and conferred, but could not resolve the

16   dispute.

17                              **III. DISCUSSION**

18         "The court may, for good cause, issue an order to protect a party or person from

19   annoyance, embarrassment, oppression, or undue burden or expense . . . ."  Fed. R. Civ.

20   P. 26(c)(1)(A).  The order may forbid the discovery in its entirety or proscribe alternative

21   means of obtaining the requested material.  *Id.*  "The party opposing disclosure has the

22   burden of proving 'good cause,' which requires a showing that specific prejudice or harm

1  will result 'if the protective order is not granted.'" *In re Catholic Archbishop of*

2  *Portland, Or.*, 661 F.3d 417, 424 (9th Cir. 2011) (quoting *Foltz v. State Farm Mut. Auto*

3  *Ins. Co.*, 331 F.3d 1122, 1130 (9th Cir. 2003)).

4      With regard to the scope of discovery, the recently amended rule provides that

5  "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any

6  party's claim or defense and proportional to the needs of the case . . . ." Fed. R. Civ. P.

7  26(b)(1).  To determine the proportional needs of the case, the Court may consider:

8          (1) the importance of the issues at stake in the action; (2) the amount
           in controversy; (3) the parties' relative access to relevant information; (4)
9          the parties' resources; (5) the importance of the discovery in resolving the
           issues; and (6) whether the burden or expense of the proposed discovery
10         outweighs its likely benefit.

11  *Id.*

12      In this case, the parties' disputes raise issues with relevancy and proportionality.

13  With regard to relevance, HOC attempts to limit Santoyo's claims to the components that

14  were replaced in Santoyo's hip.  Specifically, HOC requests that the Court "narrow the

15  scope of Plaintiff's discovery to the LFIT femoral head, the Trident acetabular cup, and

16  the Trident polyethylene insert." Dkt. 19 at 12.  While the relevance of these components

17  is obvious, the Court likewise finds that discovery relating to the specific stem that was

18  implanted into Santoyo is also relevant.  Santoyo argues that the "TMZF stem still had a

19  direct causal relationship with Plaintiff's injury and is an appropriate subject for

20  discovery" because "titanium in the TMZF stem and chromium/cobalt in the LFIT head,

21  created the corrosion problem that caused Plaintiff injury." Dkt. 27 at 6.  At this point,

22  Santoyo has presented a plausible metal-on-metal theory for the system failure, and HOC

1   has failed to show good cause to prevent Santoyo from obtaining discovery on every

2   component that was placed inside her body during this hip replacement surgery.

3   Therefore, the Court denies HOC's motion with regard to the TMZF stem.

4          On the other hand, the Court finds that, at this time, Santoyo has only shown

5   minimal relevance of the recalled components.   In fact, Santoyo appears to

6   misunderstand the nature of the recalled components in alleging that "injuries have also

7   occurred when the TMZF stem was used in the now-recalled cobalt/chromium

8   Rejuvenate and ABG-II [products]." Dkt. 27 at 7.  HOC explains that Rejuvenate and

9   ABG-II are also stems, which, if used in conjunction with the TMZF stem, would be

10  "like nailing two nails into the same hole . . . ." Dkt. 28 at 5.  While the Court declines to

11  resolve factual disputes at this juncture, it is sufficient to conclude that HOC has shown

12  good cause to prevent Santoyo's discovery requests based on the possible

13  misunderstanding of the components in question.  Therefore, the Court concludes that the

14  relevance of the recalled components is minimal, if there is any relevance at all.

15         With regard to proportionality, Santoyo does not appear to dispute that she is

16  requesting thousands of pages of documents.  Dkt. 27 at 10.  The parties, however, do

17  dispute the resources HOC would be required to expend to honor Santoyo's requests.

18  HOC "estimates that [Santoyo's requests] would require it to produce between

19  approximately 750,000 and 1 million pages of discovery at the staggering cost of over $3

20  million dollars." Dkt. 28 at 2.  These estimates are based on HOC's attorney's

21

22

1    experience with similar prior litigation. *Id*. at 29–31.[1]  While his experience is relevant,

2    greater detail should be provided in the future. Santoyo contends that "many of these

3    documents may already have been compiled in other litigation and their production may

4    merely take a few computer keystrokes to produce."  Dkt. 27 at 10.  This assertion is

5    supported by the fact that the Rejuvenate and ABG II components are the subject of a

6    multi-district litigation. *Id*. at 11.  In light of the slight relevance at this point, the amount

7    in controversy[2] and the vast amount of discovery sought, the Court concludes that HOC

8    has shown good cause to preclude discovery as to the Rejuvenate and ABG II

9    components at this time.  Therefore, the Court grants HOC's motion on these issues.

10            Going forward, the parties should strive to resolve these disputes without Court

11    intervention.  If Santoyo obtains evidence or opinion testimony establishing greater

12    relevance of the recalled components to her injury, the parties are directed to meet and

13    confer regarding the parameters of additional discovery.  In the event that Court

14    intervention becomes necessary, the Court requests actual facts as to the number of

15    documents, whether they have already been produced, and, if possible, the amount of

16    work required to review and produce such documents.

17

18

---

19           [1] Although this evidence was improperly submitted with the reply brief, Santoyo is not
20    prejudice by the Court accepting the assertions for comparative purposes only. *Provenz v. Miller*,
      102 F.3d 1478, 1483 (9th Cir. 1996).

21           [2] The record is lacking detail as to what Defendant's exposure is to damages if liability is
22    found. From the information that is available, that amount is likely less than the anticipated cost,
      as estimated by the Defendant, to produce the requested discovery.

# IV. ORDER

Therefore, it is hereby **ORDERED** that HOC's motion for protective order (Dkt. 19) is **GRANTED in part** and **DENIED in part** as stated herein.

Dated this 5th day of May, 2016.

BENJAMIN H. SETTLE
United States District Judge